**BROWN & ROOT, INC., Appellant,**

v.

**Sharon Lee GRAGG et al., Appellees.**

**No. 15504.**

Court of Civil Appeals of Texas.

Houston (1st Dist.).

July 11, 1969.

Rehearing Denied Sept. 11, 1969.

William R. Eckhardt, Vinson, Elkins, Searls & Connally, of counsel, Houston, for appellant.

Joseph D. Jamail, John Gano, Houston, for appellees Sharon Lee Gragg and her minor children.

James G. Sargent, Houston, for appellee-intervenor, United States Fidelity & Guaranty Co.

PEDEN, Justice.

Suit for damages for the injuries to and the death of James B. Gragg in an explosion at the Rezloff Chemical Company on August 9, 1965. The suit was brought by the widow, Sharon Lee Gragg, individually and as next friend of her three minor children, against the appellant, Brown & Root, Inc., the Ohio Injector Co., Pfaudler Co., Crane Packing Co., Southern Engine & Pump Co. and Gould Pumps, Inc. Appellee United States Fidelity & Guaranty Co. filed an intervention to recover benefits paid under the Workmen's Compensation Act.

Brown & Root built the Retzloff plant and had not yet completed it when the explosion occurred, but Retzloff had begun operating it. Brown & Root had installed the steam line and valve leading to the large steel vessel known as the R–500 reactor which exploded, causing the death of James Gragg. He was a Retzloff employee and was engaged in operating the reactor when it exploded.

The capacity of the reactor was about 3,000 gallons; it was only about one-fourth to one-third full of methyl parathion, an insecticide, when the explosion occurred. The reactor was made of steel. Its interior was lined with glass, and there was a steam jacket beneath it and around its sides. The product had been placed in the reactor and steam had been introduced into the jacket to help distill off a fluid that had been used as a carrier or vehicle for the methyl parathion. After a certain amount of this carrier fluid had been distilled off, the valve in the steam line had been closed to allow the methyl parathion to cool, and a few hours later, at about 9:50 a. m. on August 9, 1965, it exploded. Appellees' theory is that although the valve in the steam line had been closed, the valve had leaked steam into the jacket of the reactor causing the chemical to be heated until it exploded; that when Brown & Root's employees installed the steam line and valve they did not properly clean out the line, and metal particles or other foreign material scarred the valve seat so that steam was allowed to pass through the valve even when it had been closed.

Defendant Pfaudler Co. built the R–500 reactor; Ohio Injector Company made the steam valve; Gould Pumps made a pump which was to be used to pump the product either into or out of the reactor; Crane Packing Co. sold a seal that had been placed in the pump, and Southern Engine & Pump Co. sold the pump. Appellees named each of these companies as a party-defendant, along with appellant, Brown & Root, and charged each with negligent design and installation, with failure to properly inspect, and with breach of warranty.

Brown & Root's answer contained a general denial and charged Gragg with contributory negligence. It also filed a cross-action against each of the other parties named as defendants in the plaintiffs' petition, alleging that it would show the court and jury that it was the negligence of these cross-defendants who, if the plaintiffs' allegations of negligence were correct, violated duties which they owed to Brown & Root, thereby entitling Brown & Root to indemnity or contribution. Pfaudler Co. and Ohio Injector Co. also filed cross-actions against the others named as defendants in the plaintiffs' suit.

Appellant's first point of error is that its motion for a mistrial should have been granted just after selection of a jury because of material prejudice to it in that appellees received the benefit of jury strikes of defendants with whom they had no conflict of interest as to any fact to be determined by the jury; appellant's second point is that the cause should be reversed and remanded because appellees' having received such juror strikes was materially unfair to the appellant.

The appellees took a non-suit as to Ohio Injector Co. after selection of the jury was begun and as to Southern Engine &

Pump Co. after the jury had been selected but before the first witness testified. However, Southern Engine & Pump Co. was still a cross-defendant in two cross-actions.

In his voir dire examination of the jury, appellees' counsel told the venire that he didn't know what the evidence would be but that his case would be directed against Brown & Root because if the evidence came in as he thought it would he believed the other parties would be absolved. He stated twice that he couldn't be sure of this, but that his case would be centered from the beginning at this point unless things changed.

Brown & Root complains of the trial court's having overruled its motion in limine by which it sought to question counsel for the other parties as to existence of an agreement whereby the appellees would receive the benefit of jury strikes of one or more of the other parties. The motion further urged that in the event it was found that no conflict of interest existed between the appellees and one or more of the other parties, that they be limited to a total of six jury strikes, and in that event Brown & Root would take a non-suit on its cross-action against such defendant.

The appellant's counsel was permitted to question other counsel in the case only after selection of the jury had been completed.

At this point in the trial appellees' counsel was questioned about any agreement made with parties other than the appellant and the intervenor. He stated that he had consulted with them as to their jury strikes, and he had told each of them, as he recalled, that if the evidence developed as it now looked like it would, he would probably dismiss as to them. He suggested that as far as their interests were the same that they attempt to correlate their effort not only on jury strikes but also on the trial. He said he had told them it might develop that he couldn't dismiss them; that something might happen which would keep one of them in.

They did confer in selecting jurors, and an examination of the jury lists shows that there were no duplications in their strikes.

■ We overrule the first point. Had appellant been able to show the existence of an unqualified agreement to dismiss parties in exchange for their jury strikes, it would have been entitled to relief, but it could not do so.

■ Whether two or more parties are each entitled to six jury strikes under Rule 233, Texas Rules of Civil Procedure, depends on whether they have interests that are, at least in part, antagonistic on one or more fact issues. Retail Credit Co. v. Hyman, 316 S.W.2d 769 (Houston Tex.Civ. App.1958, writ ref.). In the instant case the trial judge was not in a position to determine, when called upon to do so, that the parties in question had no antagonism between them as to any fact issue. A lack of antagonism was not demonstrated by the recited statement by appellees' counsel, and the parties in question had on file current pleadings alleging that James Gragg's death was caused by the negligence of one or more of such other parties; although depositions had been taken from a number of those who might have been expected to testify, the discovery shown in the record does not foreclose the possibility that Brown & Root or some other party might have been able to raise a fact issue in support of these allegations. Careful preparation for trial does not always prevent an attorney from being surprised by the introduction of evidence vital to the outcome of his client's cause.

■ "Parties on the same side of the docket may be entitled to separate peremptory challenges even though no affirmative relief is sought by one against the other. The plaintiff here charged each of the defendants with different acts of negli-

gence, and the jury by its answers might have acquitted one defendant of negligence and found that the other was responsible for the collision. Miss Tamburello alleged that the negligence of Crutchfield was the sole cause of the accident, and the defendants also advised the trial court that they were each claiming that the accident was caused solely by the negligence of the other. Their interests were clearly antagonistic on some of the issues submitted to the jury, and it is our opinion that the trial court erred in denying them six peremptory challenges each." Tamburello v. Welch, 392 S.W.2d 114 (Tex.Sup.1965).

■ Appellant also complains about the other parties' having collaborated in making their jury strikes. Parties who are entitled to separate strikes may confer in making them. Parker v. Traders & General Insurance Co., 366 S.W.2d 107 (Eastland Tex. Civ.App.1963), modified 375 S.W.2d 714 (Tex.Sup.1964).

■ We also overrule appellant's second point of error. We know of no Texas authority for reversing the judgment in a cause by reason of its having developed during the trial that the allegations in the parties' petition indicating antagonisms as to fact issues were not substantiated.

Appellant's third point asserts that the trial court erred in overruling its motion for mistrial based on inflammatory and materially prejudicial jury argument by appellees' attorney. We will not recite all of the statements complained of. They were not so prejudicial that they could not have been cured by a proper instruction.

■ One matter about which appellant complained in its motion for mistrial was that appellees' counsel informed the jury of the effect of its answers. No objection was made to the argument on this basis, and the motion for mistrial was not made until the jury had retired to consider its verdict. This was too late. Texas

Employers' Ins. Association v. Haywood, 153 Tex. 242, 266 S.W.2d 856 (1954).

Another basis for complaint raised by appellant in its motion for mistrial was the comment of appellees' counsel on the absence of the witness Sims. Sims had been identified as the Brown & Root employee who had installed and perhaps had been the one who cleaned out the steam line and the valve leading to the R-500 reactor. He did not appear as a witness. The record is silent as to whether Sims was employed by Brown & Root at the time of the trial. In his opening argument appellees' counsel, Mr. Jamail, said, "Where is Mr. Sims? He was their foreman; we didn't hire him."

Mr. Eckhardt, attorney for Brown & Root stated in his argument that he was surprised at Mr. Jamail's asking where Mr. Sims was; he must have forgotten their telephone conversation. Mr. Jamail immediately stated that he had "never had a telephone conversation with this man in my life about a Mr. Sims." The court then instructed the jury to decide the case on the evidence as it came from the witness stand, coupled with the law given by the court.

Thereafter the two attorneys traded a number of unsworn declarations and the trial judge repeated his instruction to the jury to decide the case on the evidence.

Appellant's counsel did not object or move to strike the argument and his motion for mistrial was not filed until the jury had retired to deliberate on its verdict.

We think no useful purpose would be served by recounting the other arguments complained of. The only other ones pointed out in the motion for mistrial were ones to which appellant's counsel objected; the trial court sustained the objections, ordered the argument stricken and instructed the jury to decide the case on the evidence from the witness stand and the law as given by the court. The arguments, though improper, were not so prejudicial that the instructions

did not eliminate the probable harm. We have considered all the evidence adduced and we conclude that the argument was not so prejudicial as to cause the jury to return an improper verdict in the case. Appellant does not complain that the damage finding was excessive.

 Point four. Appellant says the trial court erred in refusing to admit in evidence expert testimony of witness Wiley Noble that the valve would not have leaked when it was in use and did not cause the explosion. We overrule this point. First, Mr. Noble was permitted to testify in response to a hypothetical question that if the valve was in the same condition before the explosion as it was when he saw it, it would not have leaked. Second, he was not shown to have any familiarity with methyl parathion or its chemical characteristics and thus was not shown to be qualified to give his opinion as to whether the valve caused the explosion. Further, the trial judge's statement that by his having sustained an objection to an earlier question he had not held inadmissible the witness' testimony as to the cause of the explosion and his suggestion that if the question was asked a different way there might be a different ruling, was not responded to by the appellant.

 Point five is that the trial court erred in admitting in evidence testimony of witness W. H. Tonn, Jr., in response to an improper question that the valve was defective, leaked steam into the jacket of the reactor and caused the explosion. The testimony in question was given more than once and on at least one occasion was made without any objection or motion to strike. The point was waived. Hubbard v. Harris County Flood Control District, 286 S.W.2d 285 (Galveston Tex.Civ. App.1956, writ ref., n. r. e.).

Appellant's sixth point is that the trial court erred in refusing to submit the following requested defensive issues:

Special Issue No. ———

"Do you find from a preponderance of the evidence that the use by Retzloff Chemical Co. of the R–500 reactor in the way in which it did on the occasion in question, with the amount of the product that was contained therein, was negligence?

"Answer: 'We do' or 'We do not.'

"If you have answered Special Issue No. ———, 'We do', and only in that event, then answer:

Special Issue No. ———

"Do you find from a preponderance of the evidence that such negligence, if any, was the sole proximate cause of the explosion in question?

"Answer: 'We do' or 'We do not.'

 "By the term 'sole proximate cause' as used in the foregoing issue is meant the only cause."

We also overrule this point. Under Rule 279, Texas Rules of Civil Procedure, failure to submit an issue shall not be deemed a ground for reversal of the judgment unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment. The first of the issues in question constitutes an improper global submission. We cannot tell which of several acts of Retzloff's employees is being inquired about. What did they do that was negligent while the reactor was only about one-fourth to one-third full of product? Did they cause the temperature of the methyl parathion to be raised above the point at which it will explode if allowed to remain at that temperature for some time? Or did they turn off the agitators too soon—or too late? Or did Retzloff fail to provide for a water supply to the jacket for more rapid cooling of the product when its level dropped below the thermocouple? Or was it that Retzloff

used the reactor while the pump and heat exchanger were blocked off?

The appellees were entitled to a specific submission of any issue seeking to identify the cause of the explosion which was raised by the evidence and the pleadings. The lumping of several possible causes into one inquiry would constitute an improper global submission and is not to be excused merely because it is the actions of a third party which are being examined. See Kainer v. Walker, 377 S.W.2d 613 (Tex. Sup.1964); Sproles v. Rosen, 126 Tex. 51, 84 S.W.2d 1001 (1935); Hicks v. Brown, 136 Tex. 399, 151 S.W.2d 790 (1941); Thompson v. Robbins, 157 Tex. 463, 304 S.W.2d 111 (1957).

It is also noted the first of appellant's requested issues, as framed, does not clearly show whether it was the negligence of James Gragg or some other agent, servant or employee of Retzloff whose conduct was the subject of the inquiry. In the event it was someone other than Gragg, the issue fails to comply with the provision of Rule 279, Texas Rules of Civil Procedure, that "a party shall not be entitled to an affirmative submission of any issue in his behalf where such issue is raised only by a general denial and not by an affirmative written pleading on his part." Appellant did not plead that the explosion was caused by Retzloff or any of its agents, servants or employees except Gragg. When Gragg came on duty that day the reactor was standing idle while the product cooled. We find nothing in the record to raise a fact issue as to any negligence on his part; the issues, as framed, did inquire as to a negligent act.

■ Point seven. No evidence, or in the alternative, insufficient evidence to support each of the first six jury findings.

Point eight. The jury's answers to the first six special issues are each so contrary to the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

In response to the first six special issues submitted, the jury found that 1) the valve was leaking steam, 2) this leaking was caused by the presence of foreign material in the steam line, 3) the failure of Brown & Root to discover such leaking condition constituted failure to use ordinary care, 4) such failure was a proximate cause, 5) Brown & Root failed to clean the steam line in such manner as a reasonably prudent contractor would have done, and 6) such failure was a proximate cause.

None of the issues submitted to the jury inquired as to the negligence of anyone but the appellant. Issues 2 through 6 were predicated on an affirmative answer to Special Issue No. 1.

These points are overruled. We have examined the entire record in this case and conclude that the verdict is supported by sufficient evidence and is not against the great weight and preponderance of the evidence.

The evidence was circumstantial in character. It was not possible for anyone to have seen whether or not the valve was leaking steam, because the damaged valve seat and the path any escaping steam might have taken were completely enclosed by steel. We will briefly notice the most significant phases of the evidence.

The temperature chart recorded a gradual decline from about 208° to about 207° over a period of more than two hours, beginning at about 7:30 o'clock on the morning of the explosion, then the temperature suddenly rose and the product exploded. The only testimony as to the temperature at which it would explode was that it would do so if kept at 248° for a period of time. There was testimony that the chart did not accurately reflect the temperature of the produce since the thermocouple was not touching it. Also, that there would be a direct relationship between the heat of the product and that of its vapors immediately above it and that the thermocouple was in those vapors.

There was no evidence, other than the fact of the explosion itself, that the temperature of the product had approached 248° for some time before the explosion. No possible source of external heat existed other than the steam line. The two expert witnesses disagreed as to whether a visible indentation on the valve seat was such as to cause the valve to leak steam. Tonn said it would leak when he saw it but that it had since been changed; the later opening and closing of the valve by others had caused the scar in the soft brass seat to become less prominent. He did not test it for a leak, but the witness Noble did; Noble exhibited a film showing that it did not leak when he tested it after it was received from Tonn. The jury had a right to accept Tonn's opinion that the valve had leaked steam when in use.

The witness who noted on the temperature chart on the morning in question that the level (of the product) was below the thermocouple, did not recall having made this notation, but he said he wouldn't have made the notation unless it had been accurate. The notation is found on the space between the 6 A. M. and the 7 A. M. lines. He was the operator on the shift that preceded James Gragg. He had adjusted the steam valve several times to vary the temperature of the product while boiling the vehicle fluid off the product. We do not know at what point the mass lost contact with the thermocouple. At no point on the chart is a temperature as high as 248° recorded, but it was being rapidly approached when the recording was apparently terminated by the explosion.

Appellant had the responsibility for properly installing the steam line and valve, and proper installation included cleaning out the line. The evidence as to the cleaning out of the steam line and valve is not easy to follow because appellant's employees seemed to testify on direct examination that they knew of their own knowledge that the line and valve had been cleaned out and the valve checked, but their testimony on cross-examination indicates that they were relying on their belief that their men had carried out their instructions.

Tonn testified that in his opinion the most prominent grooves in the valve seat were caused by a piece of pipe cutting which caught under the seat of the valve making a characteristic semi-circular groove, damaging the valve seat so it would no longer close completely. The plaintiff is not required to establish causation in terms of certainty. There was expert testimony fairly supporting the conclusion that the groove in the valve allowed steam to leak to the reactor and that this, being the only source of external heat, caused the explosion.

Having decided that the verdict is not contrary to the great weight and preponderance of the evidence, we will not discuss the appellant's no evidence and insufficient evidence points in view of appellant's heavier burden as to them.

Affirmed.