**GENERAL MOTORS CORPORATION,**
Appellant,

v.

Bernard A. **HEBERT** et al., Appellees.

No. 16160.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Nov. 8, 1973.

Rehearing Denied Dec. 6, 1973.

Vinson, Elkins, Searls, Connally & Smith, B. Jeff Crane, Jr., Daniel A. Hyde, Houston, for appellant; Ross L. Malone, Thomas W. Watkins, Detroit, Mich., of counsel.

Jamail & Gano, Joseph D. Jamail, John Gano, Gus Kolius, Hofheinz & Harpold, Houston, for appellees Bernard A. Hebert and others.

Lorance & Thompson, Tom Lorance, Houston, for appellee Boyd Mullen Chevrolet, Inc.

PEDEN, Justice.

This is a products liability case arising out of a one-car accident on Interstate Highway 45 north of Houston.

On July 13, 1969, Mrs. Dorothy Hebert, a secretary for Our Lady of Mount Carmel Church, was driving a 1969 Chevrolet Impala to St. Louis, delivering it to one for whose use it had been purchased by the church from Boyd Mullen Chevrolet Co. two days earlier. Near Madisonville, while traveling in the left lane of the highway at approximately 60 to 70 miles per hour, the Chevrolet veered to the right, crossed the outside lane, struck the shoulder of the road, turned back toward the pavement and rolled over once. Mrs. Hebert was thrown partially out of the vehicle and died several hours later, never having regained consciousness.

Mrs. Hebert's husband, Mr. Bernard Hebert, individually, as next friend for a minor son "and for the use of those entitled to recover for the wrongful death of Mrs. Hebert," sued General Motors Corporation, who manufactured the vehicle, and Boyd Mullen Chevrolet, who sold it to the church, alleging that General Motors was negligent and also breached its express and implied warranties in that the steering assembly of the automobile was defectively designed, manufactured, assembled, installed and was made of defective parts. Also that Boyd Mullen Chevrolet was guilty of negligence and breach of warranties in selling the car while it was in a defective condition, when it knew or should have known of or discovered said defective conditions and in failing to inspect the car and warn the deceased and the plaintiff that it was defective and unsafe.

Boyd Mullen Chevrolet brought a cross-action against General Motors for indemnity, and the church intervened to recover for the loss of the car.

Defendant General Motors filed a general denial to the cross-action and to plaintiff's petition and alternatively pleaded, in answer to plaintiff's petition, unavoidable accident, contributory negligence, and that the sole proximate cause was the acts or omissions of a third person.

In answer to special issues the jury found that 1) the steering shaft coupling installed by General Motors was defective when it left General Motors' custody, 3) the design of the steering shaft coupling was defective, 5) the steering column assembly was defectively installed by General Motors and 7) the design of the capsules on the steering column assembly was defective. By affirmative answers the jury found, in response to even-numbered issues following each of these issues, that each of the defects found was a producing cause of the accident in question. Damage findings in favor of Mr. Hebert and his sons amounted to $238,250.

The trial court's judgment awarded Boyd Mullen Chevrolet indemnity from General Motors.

General Motors contends in Points of Error Nos. 1, 2, 3 and 5 that the trial court erred in entering judgment, in overruling and failing to sustain its motion for new trial, in overruling its amended motion for mistrial and in overruling its motion to set aside the verdict of the jury or, in the alternative, for judgment notwithstanding the verdict because the trial of this cause was conducted in such a way that it was tantamount to a fraud upon the courts of this state and upon General Motors, so any

jury verdict obtained as a result of that fraud should be set aside.

General Motors' fourth point of error was:

"The trial court erred in rendering judgment that Defendant and Cross-Plaintiff Boyd Mullen Chevrolet recover from Defendant General Motors Corporation full indemnity and in overruling Defendant's Amended Motion for New Trial because by agreement with Plaintiff, Boyd Mullen Chevrolet offered no defense in this cause and for all practical purposes confessed judgment for such damages as the jury might find and this Defendant is not in law and should not be held responsible for such confession of judgment."

General Motors asserts in arguing these points that several affirmative courses of conduct engaged in by Mr. Joe Jamail, who represented the Heberts, and Boyd Mullen's attorney, Mr. Tom Lorance, in the trial of this case were tantamount to fraud and collusion: 1) that Mr. Lorance agreed to assist Mr. Jamail in the trial of their case provided Mr. Jamail would not present any evidence of independent negligence on part of Boyd Mullen, which, if proven, would require Boyd Mullen to pay half of the judgment under the rule enunciated in Ford Motor Co. v. Russell & Smith Ford Co., 474 S.W.2d 549 (Tex.Civ. App.—Houston 1971, no writ), 2) that Mr. Lorance and Mr. Jamail had an unqualified agreement to protect Boyd Mullen, as a result of which some of Mr. Lorance's peremptory challenges of jurors were made at Mr. Jamail's suggestion 3) that pursuant to their agreement, Mr. Lorance let Mr. Jamail lead his witnesses into showing that General Motors was exclusively to blame and, although no jury issues inquired as to independent negligence on the part of Boyd Mullen, Mr. Lorance argued to the jury that General Motors was at fault, thus Mr. Lorance demonstrated that he and Mr. Jamail had entered into a collusive

agreement to defraud General Motors of its right to a fair trial.

Further, that Boyd Mullen has not appealed from the judgment, so it is final as to Boyd Mullen, and this indicates an agreement by plaintiffs not to execute on the judgment as to Boyd Mullen.

Prior to rendition of judgment in this case General Motors filed a petition for removal to the U. S. District Court, alleging that General Motors had been wrongfully denied its remedy of federal diversity jurisdiction by the conduct of adversary counsel during the course of the state court trial. The statement of facts from the hearing in the federal court was put in evidence by agreement in the state court's hearings on General Motors' motions for mistrial and the later hearing on its motion for new trial. A motion to remand to the state court was filed by Mr. Hebert. After a hearing in federal court, the cause was remanded to state court. Prior to remanding the case to the state court on November 28, 1972, the federal judge heard testimony from Mr. Jamail and Mr. Lorance. We summarize that testimony, quoting parts of it.

"Q (By Mr. Crane): . . . What I am trying to ask is, to go back to the beginning of your conversation with counsel for Plaintiff (Jamail) with respect to what might be done between Plaintiff on one hand and Boyd Mullen Chevrolet on the other hand in the trial of this case that would inure to the benefit of Boyd Mullen Chevrolet. Can you bring us up to date on that?

"A (Mr. Lorance): I had many conversations with counsel for Plaintiff. . . .

". . . .

"A . . . Most of them were an attempt to settle unilaterally in behalf of Boyd Mullen Chevrolet. . . . Now, as we approach the time of trial in getting the case ready for trial Mr. Jamail assured me that he was going to seek to recover

from General Motors and didn't want me as an enemy in the trial. . . .

". . . .

"I could feel relatively safe from any ultimate recovery being made against my client unless I . . . strenuously defended the case during the trial, and that we were all confident that there . . . would be no evidence unless you (General Motors) produced it, of any independent knowledge on the part of Boyd Mullen, and that he would not . . . strenuously . . . seek to make a case of evidence against Boyd Mullen independent of the case of strict liability with which I was faced unless · I strenuously defended the case."

Mr. Lorance was further asked:

"Q . . . when the jury was selected in the case . . .

". . .

"Was it then your understanding that if you would not resist the Plaintiff's case with respect to factory defect, the Plaintiff would not actively assert any case against Boyd Mullen Chevrolet other than the factory defect liability?

"A Yes, I felt that.

"Q Did you feel that as a result of what you had been told?

"A Yes.

"Q By whom?

"A Mr. Jamail.

"Q Had you discussed this specific matter with Mr. Jamail?

"A Yes."

Mr. Lorance admitted that ·he urged the jury to give affirmative answers to the special issues which would fix liability against both General Motors and his client, Boyd Mullen, explaining that in so doing he also sought to fix liability in his client's favor on its cross-action against General Motors.

Mr. Crane asked:

"Q All right. Now, in that conversation we had there that evening before the case was submitted to the jury on the following morning, I asked you why you were taking that position with the jury, did I not?

"A Yes. You did.

"Q And you told me you were taking that position with the jury because that enables you to get in position where you could contend on appeal that a dealer was entitled to indemnity solely on the basis of jury findings of a defective product as distinguished from negligence or any other form of liability?

Isn't that correct, sir?

"A That's part of my answer.

I remember I told you that . . . . but I also said something to the effect that the development of the trial had been such that I had become convinced the jury was going to find a defect, so I was going to argue honestly to the jury about finding a defect, because I thought they were going to anyway.

"Q All right.

"A Now, with regard to the other point . . . We know the seller of a product can be liable under the theory of strict liability for a defect even though he didn't make the defect; he just sold it.

"The question is whether a selling dealer or a distributor in a cross-action against a manufacturer is entitled to indemnity based on the theory of strict liability under Section 402A of Restatement of Torts and the McKisson case.

"I am satisfied that that question has not been answered by the State of Texas appellate courts.

"The La Roca case, in which I was—in which I participated, ended up with some dictum—dictum only—but that was not the case; that a dealer wasn't a consumer and,

therefore, couldn't rely on the theories of strict liability.

" . . .

"And this case seemed—the Hebert case seemed to me to be the perfect vehicle by which to settle that legal question.

"I think that is the way I talked to you that evening, Jeff.

"Q Right. I agree with you.

"A Okay.

"Q Now, as for specifics, the La Roca case was a case decided, I think, by the 14th Court of Civil Appeals styled Ford Motor Company vs. . . . Russell & Smith.

" . . .

"Q All right. Now, our conversation about whether or not a dealer in these circumstances is entitled to indemnity solely under Section 402A of the Restatement of Torts Act (sic), and goes back something like a year and a half, does it not?

"A . . . or longer. Maybe two years or more. You and I have talked about it many times.

"Q All right. And we have previously talked about this legal problem, whether or not a dealer, as such, fell under the definition of 'consumer' in Section 402A?

"A Yes, sir. Sure have.

"Q All right. Now, in this conversation that you and I had on this evening before the case was submitted to the jury—and it keeps coming back to me that this is October the 18th—I may be wrong about the date—in that conversation you and I again discussed that very problem and the problem of the Court's dictum in the La Roca case, or Ford Motor Company v. Russell-Smith Ford, indicating to both of us that a dealer was not so entitled to indemnity under 402-A, did we not?

"A Yes. We did.

" . . .

"Q Okay. Now, we discussed that problem the night before the case was submitted to the jury and you pointed out to me that you and your client in this case had decided that the Hebert case, because of the newness of the automobile and other facts specifically, that so far as we then knew nothing had been done to the Hebert car by the selling dealer; this was the best opportunity you were going to have to establish what you thought should be the law in the appellate courts of Texas?

"A Yes. Sure did.

"Q All right. Now, in that conversation I told you that if a judgment for indemnity were entered in favor of Boyd Mullen Chevrolet in the Hebert case no appeal was ever going to be taken from that judgment by General Motors Corporation, did I not?

"A Yes. Or something to that effect. That's true. And also in a similar conversation in the Court's chambers, either while we were working on the charge or in the morning before the argument, which would be the next morning, or both. I think the conversation went the next step.

" . . .

"and it was suggested then, then why doesn't the Plaintiff non-suit as to me, and he refused to, and then it was suggested that I move for an instructed verdict, there being no independent negligence against me—against my client, and then is when I explained that in my judgment I couldn't afford to take the instructed verdict for fear that my client's legal rights would be determined on appeal, there being strict liability against me, without my being a party to the appeal, so that I had to stay in the case. . . . .

"Q All right. I understand what you said then and I understand it now.

" . . .

"What I am trying to establish at this point, Mr. Lorance, is before you and I discontinued our conversation on the evening before the case was submitted to the

jury I had made it completely clear to you that in the event a judgment was entered against Boyd Mullen Chevrolet and General Motors Corporation on behalf of the plaintiffs in this case, and a judgment for indemnity was entered on behalf of Boyd Mullen Chevrolet against General Motors Corporation, General Motors Corporation was not going to take an appeal from the indemnity portion of the judgment?

"A Yes. And I said, 'Oh, that's correct'. . . . And then I said, 'But I got in a trap in the La Roca case where I had it all the way won at the trial court level and without anybody moving or asking the appellate court to do it, I ended up with the appellate court rendering a judgment that I pay half of it.'

"Q All right.

"A . . . and I—and I did. And I determined—I just made a vow to myself I was going to stay to the end hereafter and protect my client's rights."

Lorance was questioned as to the content of a conversation between himself and Jamail:

"Q All right. Let's come down to the October 6th, 1972 conversation.

" . . . .

"There was a conversation between you and Mr. Jamail?

"A Yes.

" . . . .

"I again urged and tried to work out a separate, independent settlement with Mr. Jamail and was unsuccessful.

"Q By a 'settlement' you mean a payment of a sum of money to compromise the liability that may have existed against Boyd Mullen Chevrolet, however it may have arisen?

"A That's right.

" . . . .

" . . . and to leave the cause of action pending against General Motors.

" . . . .

"Q All right. Now, in this October 6th conversation with Mr. Jamail did you reach what you characterized as an agreement with him?

"A Yes. But the word 'agreement' bothers me as to meaning.

" . . . .

"But we had an understanding.

"Q What were the terms of the understanding?

"A Well, it was probably pretty loose, truthfully. Now, I have already stated the essence of the understanding.

"Q Well, I just want to get it, now, in the terms of an understanding, if you don't mind.

"A All right.

"Q But you understood what you were going to do in exchange for what you understood Mr. Jamail was going to do, if anything?

"Yes. Yes. And the reason was that this would put me in a position if the case was to be lost; that is, from the defendant's standpoint, of having my right of indemnity against General Motors.

" . . . .

" . . . because the liability—if all this worked out, the liability would be based on defect, for which Boyd Mullen was liable, but it would be the basis for the recovery by Boyd Mullen of indemnity against General Motors.

"Q Mr. Lorance, rather than me trying to ask you something in the nature of a leading question, now, I think it would be better if you could at this point just spell out for the Court what your understanding was at that time with Mr. Jamail. I am talking about the October 6th conversation.

"A Right. . . . .

" . . . that Boyd Mullen would not be actively, independently pursued as a defendant for its own negligence in return

for my . . . . not strenuously defending the case of defect . . . knowing full well that the matter of defect would put liability on me."

Mr. Lorance testified that none of the evidence in the trial tended to show any negligence on the part of Boyd Mullen.

The following questions were asked by Mr. Crane and answers given by Mr. Jamail:

"Q   Prior to that trial, did you have any conversations with Mr. Lorance concerning the arrangements or understanding with respect to what the respective parties, the plaintiffs and Boyd Mullen Chevrolet, would do in the trial of the case?

"A   I did not have any such discussion. Those points that you just asked me— you're talking about trial tactics?

"Q   Yes, trial tactics.

"A   Did not.

"Q   Did you ever discuss or talk to Mr. Lorance about whether or not evidence of negligence on the part of Boyd Mullen Chevrolet would be introduced by the plaintiff?

"A   I never did talk to him about that.

"Q   Did you ever discuss with Mr. Lorance the possibility that only evidence of a manufacturing defect would be introduced by the plaintiff if Mr. Lorance did not seriously resist that kind of case against his client?

"A   That happened after the case began, Mr. Crane—not actively resist. . . .

". . . —at this point I had subpoenaed his service manager, and a recess had been taken after he had been on the stand for some time, and I was trying, as you remember or know, to prove an inspection, issue on the part of Boyd Mullen and their make-ready department. They have a sheet that General Motors gives them, Your Honor, that puts them under a general classification, steering, this is a steer-

ing defect case. The car was three days old when it crashed.

"I couldn't see any way in the world I could let this car go period because under this make-ready steering sheet, they had listed steering, and I was attempting to show that it was a duty on the dealer to inspect this. The dealer said we don't inspect the coupling, we inspect the steering wheel; we test drive it and we test the tie rods to it. I was unable to make a case of inspection at that time I thought. It was at that time I told Tom Lorance that if you don't bring an expert to help General Motors on the defect, the manufacturer's defect, I won't pursue any further the attempt to prove a negligence issue on Boyd Mullen.

"He asked me at that time if I would non-suit him. I told him at that time I would not non-suit him. It was my intention . . . to take judgment against both of them at that time, and that was the extent of my discussion at that point.

"Q   Did you have any conversations before or during the trial as to whether or not he would resist or resist strongly any efforts to fasten liability on his client, Boyd Mullen Chevrolet or in any other respect?

" . . . .

"Before the trial began?

"A   No.

"Q   During the trial?

"A   Yes.

" . . . .

"Q   I said any other conversations besides that?

"A   Yes, he began to cross examine a witness that you had put on, your expert, very favorably, I thought to you. I again, at the recess, told him that I thought he was not going to take such an active part, and we had some few words of discussion there at that recess about that, and his remarks to me were pretty much what they

were to you, and he told me, he said 'I'm going to represent my clients the way I think best, not the way you tell me to.'

"Q Are those all of the conversations you had with Mr. Lorance concerning these arrangements or understanding?

"A I never had an arrangement. The understanding that I had with him was—if you'll ask me specifically, I can tell you. . . ."

As to whether the attorney for Boyd Mullen had a definite agreement to give the plaintiff some of its jury strikes in exchange for protection from an adverse recovery, the testimony before the trial court included the questioning of Mr. Lorance and Mr. Jamail by Mr. Crane.

Mr. Lorance related that he and Mr. Jamail had had a relatively loose arrangement whereby Mr. Jamail was going to suggest some strikes he would like Lorance to make. Jamail suggested some and Lorance disagreed; he refused to strike about three. The other three he either agreed with or took Jamail's suggestion and struck. This was done in accordance with a pre-trial arrangement "only in the sense that we had . . . agreed that we would discuss our strikes together." No double strikes were made between the attorneys for the three parties.

Mr. Jamail denied making any arrangement or agreement with Mr. Lorance before the trial began, and indicated that he did not reach any kind of an understanding with Mr. Lorance until Boyd Mullen's service manager was being cross-examined. Jury selection would have been completed before that time.

■ The trial judge overruled the appellant's amended motion for new trial. No express findings appear in the record, so it is to be presumed on appeal that the trial court found all controverted facts in support of its order overruling the motion.

Under the record we hold that the trial court did not err in rendering judgment on the verdict and in overruling General Motors' motions for mistrial, for new trial, for judgment non obstante veredicto and its motion to set aside the verdict.

■ We held in Brown & Root, Inc., v. Gragg, 444 S.W.2d 656 (Tex.Civ.App., 1969, writ ref., n.r.e.), that parties who are entitled to separate jury strikes may confer in making them, but that an unqualified agreement to dismiss a party in exchange for its jury strikes constitutes reversible error. In the instant case error has not been shown in the matter of the jury strikes. The trial court was not required to find from the evidence that the attorneys agreed to exchange Boyd Mullen's jury strikes for a non-suit or other form of protection.

■ Nor was the trial court required to conclude from the evidence that Mr. Lorance and Mr. Jamail acted in collusion or fraud against General Motors. Under the facts as related by Mr. Lorance, when he was unable to obtain from General Motors an indemnity agreement or from the Heberts either a dismissal or a settlement of their claim, he reached an understanding with Mr. Jamail that the Heberts would not strenuously try to show independent negligence on the part of Boyd Mullen if Boyd Mullen did not strenuously defend the design or assembly of the steering gear.

Attorneys engaged in the trial of cases have heavy responsibilities, and must have latitude in making tactical decisions as to how best to represent their clients within the bounds of propriety.

Under the pleadings in this case both General Motors and the Heberts could have offered evidence of independent negligence on the part of Boyd Mullen. General Motors' counsel told Mr. Lorance that his client would not appeal from a judgment for indemnity in favor of Boyd Mullen, but Mr. Lorance has explained his dilemma, and his reluctance to accept less than a promise of indemnity is understandable.

The record reflects that Mr. Jamail questioned Boyd Mullen's service manager about his company's inspection of the car as part of its process of making it ready for delivery. We do not agree with appellant that there is necessarily anything reprehensible, under the record before us, in the fact that as his questioning of the witness progressed, the framing of Mr. Jamail's questions indicated a lessening of interest in showing negligence on the part of Boyd Mullen or even in his indications that he thought Boyd Mullen was not negligent.

Even in the best prepared cases it is not unusual that the testimony fails to develop as anticipated, requiring changes in strategy. In cases such as this, when one of the jury's primary tasks is to determine which conflicting theory as to the cause of the accident is most acceptable, it is particularly important for each party to present a position which the jury can find reasonable.

This is not to say that the courts encourage the adopting of an adversary stance by parties who are seeking the same result.

Appellant points out that even though the trial court submitted no issues as to independent negligence on the part of Boyd Mullen, Mr. Lorance argued to the jury a theory that would make General Motors liable, thereby asserting the only position that could, at that stage, lead to a judgment against Boyd Mullen in addition to General Motors. Appellant says that the Heberts then submitted a proposed judgment which would have found in their favor only against General Motors, and although this would have ended Mr. Lorance's test case for indemnity, he signed it, so it appears he was being let off after upholding his part of the bargain.

Appellant's position is not illogical, but we cannot say that the trial court was required to reach that conclusion. We overrule the appellant's first five points of error.

General Motors next asserts these points of error:

6. The trial court erred in rendering judgment against defendant General Motors because there is no evidence of any wrongful act, neglect, carelessness, unskillfulness or default on the part of the defendant which contributed to, caused, or proximately caused the death of plaintiff's decedent, Dorothy Hebert.

7. The trial court erred in rendering judgment against defendant General Motors because there are no jury findings of any wrongful act, neglect, carelessness, unskillfulness or default on the part of the defendant which contributed to, caused or proximately caused the death of plaintiff's decedent, Dorothy Hebert, and no such findings were made or authorized by the trial court.

8. The trial court erred in submitting to the jury over the timely and proper objection of defendant General Motors issues concerning alleged defects in the product even though such issues could not form the basis for judgment against this defendant.

The thrust of General Motors' argument under these points is that even though a manufacturer of a defective product is liable under the doctrine of strict liability, recovery under Article 4671, Vernon's Ann. Texas Civil Statutes, the Texas Wrongful Death Act, is precluded because that statute authorizes recovery only if the injury causing death "is caused by the wrongful act, neglect, carelessness, unskillfulness or default of another" and that the act must be wrongful in the sense of being an act to which legal culpability attaches, such as negligence.

Art. 4672, V.T.C.S., provides:

"The wrongful act, negligence, carelessness, unskillfulness or default mentioned in the preceding article must be of such character as would, if death had

not ensued, have entitled the party injured to maintain an action for such injury."

The Texas Supreme Court stated in Vassallo v. Nederl.-Amerik Stoomv. Maats. Holland, 162 Tex. 52, 344 S.W.2d 421 (1961), "It is our opinion that under the express provisions of the Wrongful Death Act, the plaintiff is permitted to assert any basis for recovery that the decedent could have asserted if he were alive, and no other; and the defendant can assert any defense to that cause of action that it could have asserted if the decedent had survived, and no other . . ."

■ It would be unjust to interpret Articles 4671 and 4672 as allowing, in products liability cases, a recovery for an injury but not for a death. In interpreting statutes, we are not to attribute to the legislature an intention to work an injustice. State v. Mauritz-Wells Co., 141 Tex. 634, 175 S.W.2d 238 (1943).

We overrule points 6, 7 and 8.

Finally, General Motors says the trial court erred in rendering judgment that Republic Insurance Co. recover from it $2,972.85 because Republic is not now and never has been a party to this suit.

The trial court's judgment recites that the stipulations of all parties ". . . indicate that there should be awarded to the Intervenor, Republic Insurance Company, the sum of $2,972.85, representing the loss of the Intervenor as a result of the accident made the basis of this suit."

■ Appellee says Republic brought the intervention in the name of Our Lady of Mt. Carmel and, having paid the church for loss of the automobile, was subrogated to the church's right of action in this cause. If so, Republic was entitled to intervene in the name of the church and would be entitled to any recovery. However, we find no support for this suggestion in the record, so we reform the judgment to substitute the name of Our Lady of Mt. Carmel as intervenor wherever the name of Republic Insurance Company appears.

The judgment of the trial court, as thus reformed, is affirmed.