Nicholas NARDONE, an infant, by his father and next friend, Nicholas H. Nardone, and Nicholas H. Nardone, Individually, Plaintiffs-Appellants,

v.

David H. REYNOLDS et al., Defendants-Appellees.

No. 72–2264.

United States Court of Appeals, Fifth Circuit.

Feb. 24, 1975.

Abraham H. Shukat, Miami Beach, Fla., Alfred S. Julien, New York City, for plaintiffs-appellants.

S. O. Carson, John H. Wahl, Jr., Frank A. Lane, Miami, Fla., for Reynolds & Hartford Ins. Co.

Raymond J. Dwyer, Steven R. Berger, Miami, Fla., for Sheffel & Med. Protect.

Carl M. Lambert, Miami, Fla., for I.N.A.

Henry Burnett, Miami, Fla., for Gargano, American Home Ins. & Metropolitan Dade County.

John R. Hoehl, James E. Tribble, Miami, Fla., for Gargano.

Before BROWN, Chief Judge, and WISDOM and AINSWORTH, Circuit Judges.

BROWN, Chief Judge:

This is an appeal from the grant of summary judgment in favor of the Florida doctor-hospital defendants in a medical malpractice suit brought by the parents of a minor in their own right and as next friends on behalf of their minor son. The District Court, assuming for those purposes that each of the defendants had been guilty of actionable negligence, granted summary judgment on the basis that the claim was barred under the four-year Florida statute of limitations. FSA § 95.11(4). Whether the summary judgment on that basis was correct turns on the application of Florida's malpractice "rule of discovery".

Young Nardone, then aged 13, entered the Jackson Memorial Hospital, a Dade County facility in January 1965. He was having some difficulty with coordination, blurred vision, byplopia and headaches. While there he underwent four brain operations in January, February and March and various diagnostic procedures including the now-much emphasized pant-opaque ventriculogram procedure (ppv). On his discharge July 3, 1965 his condition was comatose, totally blind. He had suffered irreversible brain damage. He remains in that condition.

The parents were told and knew that this was the boy's condition prior to his discharge, that is totally blind, no longer able to walk and beyond help or hope of recovery. Mr. Nardone testified that Dr. Smith "let me feel at the time that the boy would no longer, his feelings were that he was totally blind, he would no longer walk and he said to me, 'no matter what you try to do from this point on if you are a millionaire you are not going to be able to help the boy' ".[1]

According to the plaintiffs, in the Fall of 1969, shortly after the expiration in July of the four-year limitation period they learned from the family physician that there might have been something wrong in the surgical and treatment procedures in Jackson Memorial Hospital. This apparently alerted them to a concern. They consulted counsel and this case was then instituted in the Southern District of Florida in May 1971, more than five years after the boy's discharge from Jackson Memorial Hospital in July 1965.

In Florida the "discovery rule" governs the time when the statute of limitations begins to run in medical malpractice cases. At the risk of oversimplification, the rule, as developed through Judicial decisions, provides that the statute of limitations shall commence when either one of two conditions precedent occur: (i) the plaintiff has notice of the negligent act giving rise to a cause of action, or (ii) the plaintiff has notice of the physical injury which is the conse-

[1]. This was confirmed by the reevaluation at Columbia Presbyterian Hospital in New York City in the Fall of 1965. The report and final diagnosis of October 19, 1965 stated:

. . . it is certain that the brain damage responsible for the decerebrate state is irreversible and that he has bilateral total blindness. The family has been advised against subjecting him to any further diagnostic or therapeutic procedures and to transfer him to a nursing home for further care. Appendix 169.

quence of the negligent act. At the bottom of the problem are the two cases of *Brooks*[2] and *Buck*,[3] or more accurately, the reading to be given to what the Florida Courts have said in those two opinions.

■ The problem arises because *Brooks* after speaking in traditional terms that the statute of limitations is not postponed by the fact that actual or substantial damages do not occur until a much later date[4] then goes on to speak in terms of notice of the invasion of the legal rights of the person or notice of an "injury".

The opinion emphasizes notice of an *injury*. "At the time of the application of the x-ray treatment there was nothing to put the plaintiff on notice of any probable or even possible injury." 70 So.2d 306, 308. It then goes on to speak in terms of invasion of a legal right. "[T]he statute attaches when there has been notice of an invasion of the *legal right* of the plaintiff or he has been put on notice of his right to a cause of action." 70 So.2d at 309. (Emphasis added).

Holding that the statute was tolled, the Court pointed out " . . . there was nothing to indicate any *injury* or to put the plaintiff on notice of *such,* or that there had been an *invasion* of her *legal rights.*" 70 So.2d at 309. (Emphasis added). And the rule announced is that " . . . the statute [of limitations] must be held to attach when the plaintiff was first put upon notice or had reason to believe that her right of action had accrued." 70 So.2d at 309.

And in *Buck* the emphasis is on awareness of an injury,[5] but the "injury" is one operationally related to treatment afforded by the physicians.

This brings us to the crux of the controversy. The plaintiffs assert that the Court's reference to "injury" and "invasion of [a] legal right" means an awareness by the victim (or derivative beneficiaries) not only of the existing physical condition (paralysis, coma, etc.) but that this was operationally related to acts or non-acts of the defendant doctors, hospitals, etc. On the other hand, the defendants individually and collectively contend that the critical thing is awareness by the victim (or derivative beneficiaries) of the physical condition without regard to whether either the victim (or derivative beneficiaries) know whether this is the result of a natural phenomenon or of acts or non-acts of the medical agencies.

In a matter of such grave consequence not only to these litigants but as a general principle for the guidance of cases bound to repeat themselves we do not find a sufficient guide in the language employed in the two cases and those following them to reach a sound decision. The trial court adopted the defendant's reading and held, as the evidence most plainly commanded, that the parents knew of the tragic condition of their son on discharge from Jackson Memorial Hospital in July 1965.

The plaintiffs, on the other hand, insist that while they knew this unfortunate result they had no knowledge of what brought it about. On their argument all of this—tragic as it was—was merely the inescapable result of the

---

**2.** City of Miami v. Brooks, Fla., 1954, 70 So.2d 306.

**3.** Buck v. Mouradian, Fla.App., 3d Dist., 100 So.2d 70, cert. denied, Fla., 1958, 104 So.2d 592.

**4.** The general rule, of course, is that where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time and the running of the statute

is not postponed by the fact that the actual or substantial damages do not occur until a later date. 70 So.2d 306, 308.

**5.** The Court stated " . . . it conclusively appears that she was aware of her injury . . . shortly after the treatments administered . . .. Her admissions . . . affirmatively established the knowledge on her part of her injury." Nowhere, the Court stated, was it " . . . able to find that [plaintiff] was without knowledge of her injury at the time, or shortly thereafter, of the administration of the x-ray treatments." Buck v. Mouradian, 100 So.2d at 71–72.

medical condition in no way influenced or affected by the treatment, the lack of treatment or the skill or neglect in its performance. It is here where their theory starts to work. Their claim is that it was not until 1969 that they learned, for the first time, that the ppv had been administered. They further claim they have medical evidence to offer which would allow a jury to conclude that this procedure either ought not to have been followed under those circumstances or, if so, it was negligently performed.

The plaintiffs' contention is that *Brooks* and *Buck* and cases following them stand for the proposition that the word "injury" means an operational condition resulting from some act or non-acts of the defendants. And for knowledge of the "injury" to trigger the statute of limitations the plaintiffs had to be aware not only of the condition but facts leading a reasonable person to the conclusion that it was due to acts or non-acts of the treating agencies. On that approach there is nothing in this record to indicate that the plaintiffs here had any actual knowledge prior to 1969 that any acts or non-acts of the defendants had brought about this deplorable condition and on the question of whether they ought to have known there would be at least a question of fact which would rule out pre-trial summary judgment.

The defendants, on the other hand, insist that the word "injury" connotes physical injury and not injury in the sense that there has been an invasion of a legal right. On defendant's theory *Buck* in its reference to "the negligent act that caused the injury" and to "injury"—one of these two distinct terms describing cause and the other effect—intended the term "injury" to denote plaintiff's physical condition (effect) as distinguished from the alleged act of negligence or legal injury (cause).

■ There is also presented the closely related if not inescapable problem of the claim of fraudulent concealment which tolls the running of the statute when it can be shown that a legal fraud has been perpetrated to place an injured person (or derivative plaintiff) in ignorance of the rights to a cause of action. See *Buck, supra;* Prather v. Neva Paperbacks, Inc., 5 Cir., 1971, 446 F.2d 338. There being no intimation in the record upon which summary judgment was granted that any one or more or all of the doctors engaged in affirmative acts of misrepresentation the issue may well turn on whether under Florida principles the fraudulent concealment can come from a failure upon the part of the doctors and hospital to affirmatively keep the patient or the parents advised of developments and activities even in the absence of any request for information by the parents.

■ As these propositions present questions of the gravest public policy to Florida in situations likely to recur frequently we think this is an instance in which we should utilize the procedure for certification to the Supreme Court of Florida for its authoritative decision on matters in which it has not only the latest, but the last word barring some possible federal constitutional claim.[6]

---

**6.** To the cases listed in Coastal Petroleum v. Secretary of the Army, 5 Cir., 1973, 489 F.2d 777, 779, n. 5, on rehearing, 1974, 491 F.2d 973, see Lehman Brothers v. Schein, 1974, 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215, in which the Supreme Court citing a number of Fifth Circuit decisions remanded the case to the Second Circuit for consideration of the advisability of certification to the Florida Supreme Court, and A. R. Moyer, Inc. v. Graham, 5 Cir., 1974, 492 F.2d 797, and West v. Caterpillar Tractor Company, Inc., 5 Cir., 1974, 504 F.2d 967.

We are therefore certifying these critical questions[7] to the Supreme Court of Florida by the certificate appended to this opinion.[8]

Case certified.

7. Following our usual practice we beseeched counsel to arrive at an agreed statement of facts and certification and failing that to furnish the Court the portions on which there was agreement or disagreement together with the definitive positions of each of the parties with reasons therefore. There was irreconcilable conflicts, not so much on the question of the uncontradicted facts under the summary judgment record, but on the general approach to a certification problem. Consequently the Court has had to pick and choose between the proposals by plaintiffs and defendants and come up with its own statement of facts and questions to be certified. The record as certified will include not only all of the briefs and records but the exchange of counsel on the proposed statement of facts, questions to be certified, objections and comments so that the Supreme Court of Florida can see firsthand, where relevant, the choices made by us.

8. Because of the evidentiary detail required the certificate is not being published since it will undoubtedly be either set out in the opinion of the Supreme Court of Florida or appended to its opinion.