Grady Michael HIGGINBOTHAM, Plaintiff-Appellee-Cross Appellant,

v.

FORD MOTOR COMPANY, Defendant-Appellant-Cross Appellee,

John Henry Lee and Veronica P. Lee, Defendants-Appellees.

No. 74–3716.

United States Court of Appeals, Fifth Circuit.

Oct. 14, 1976.

---

Ben L. Weinberg, Jr., F. Clay Bush, Atlanta, Ga., for appellant.

William O. Carter, Hartwell, Ga., Sam S. Harben, Jr., Gainesville, Ga., for Higginbotham.

Julius M. Hulsey, Gainesville, Ga., for J. H. Lee and V. P. Lee.

Appeals from the United States District Court for the Middle District of Georgia.

Before BROWN, Chief Judge, and GOLDBERG and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge:

In this Georgia diversity case, confined as we are to the narrow tracks of Erie,[1] we must decide how the Georgia courts would treat a potpourri of issues arising out of a collision between two automobiles. Plaintiff Grady Michael Higginbotham sued Ford Motor Company and the Lees (Veronica P. and her father, John Henry) for the wrongful death of his wife of six months, Diann Bradshaw Higginbotham, and for his own personal injuries.[2] At the trial, the jury's answers to special interrogatories called for awards of $40,000 against Ford

for the wrongful death and $10,170 against the Lees for the personal injuries. Ford moved unsuccessfully for a judgment notwithstanding the verdict. It now appeals to this Court from the denial of that motion; Higginbotham cross-appeals, alleging that the lower court erred in permitting the jury to apportion damages between the two co-defendants and in refusing to grant a new trial limited to the issue of damages on his personal injury claims.

For the reasons developed below, we think that Ford must prevail in its direct appeal. Furthermore, we find an irreconcilable inconsistency in the jury's answers to the ambiguous proximate cause interrogatory and the personal injury damages interrogatory. Therefore, although apportionment of damages between Ford and the Lees was appropriate in principle, we must remand the issues of proximate causation and apportionment of the personal injury award to the district court for reconsideration by a new jury. Finally, because we agree that the amount of the damages for Higginbotham's injuries was not as grossly insufficient as he contends, we leave that finding from the first jury undisturbed. Thus, we affirm the district court's denial of a partial new trial on amount of damages and reverse and remand on the proximate cause and apportionment issues.

I. FACTS

On Wednesday, December 16, 1970, near Elberton, Georgia, Diann and Michael Higginbotham's 1970 Ford Maverick was involved in a left front to left front collision with the Lees' Dodge. According to testimony adduced at the trial, when the two vehicles met, the primary force of the impact was driven against the wheel assembly, which was tied to the suspension. The structure of 1970 Mavericks was such that the force on the left front side of the car caused the engine compartment to rotate

---

1. *Erie Railroad v. Tompkins,* 1933, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

2. Plaintiff's Amended and Recompiled Complaint also showed Claude Ray Ford Sales, Inc.,

as a defendant. During the trial, however, plaintiff dismissed Claude Ray Ford Sales, with prejudice. *See* Transcript at 314–15.

counter-clockwise, but the passenger compartment did not rotate with the front half. Instead, the left frame rail bent and the front section of the car was crushed into the front seat, injuring Michael and killing Diann.[3]

■ Plaintiff's expert testified that if the two frame rails of the car had been tied together with a solid piece, in a manner similar to the construction of Ford's Mustang, the frame rail would not have bent so badly. A logical deduction from this evidence is that the Mustang-type design would have substantially lessened the "second impact" injuries.[4]

Plaintiff's complaint contained two counts. Count I alleged that Veronica Lee had operated the Dodge negligently, that Ford had negligently designed and manufactured the Maverick, and that the Maverick had latent defects of which Ford was aware; Count II charged that Ford had breached express and implied warranties, and that Ford's breach of warranty coupled with the Lees' negligence caused the injuries and death. In response to Count I, Ford decided the allegations of negligent design and manufacture and asserted as defenses that plaintiff was the negligent party, that Ford had breached no duty, and that other persons had caused the injuries. Similarly, in response to Count II Ford denied breaching any warranties and reasserted the Count I defenses.

## II. Jury's Verdict

The trial court submitted both of plaintiff's theories to the jury in the form of special interrogatories under Rule 49(a), Federal Rules of Civil Procedure.[5] The interrogatories, with the jury's answers, were as follows:

As to defendants Lee:

1. Who was driving the Maverick?
 Mr. Higginbotham ( )
 Mrs. Higginbotham (X)

2. Was Miss Lee negligent and if so, was her negligence a proximate cause of the collision?
 (X) Yes; ( ) No.

3. Was the driver of the Maverick negligent and if so, was that negligence a proximate cause of the collision?
 (X) Yes; ( ) No.

4. If both Miss Lee and the Maverick driver were proximately negligent,

---

3. Our description of the accident represents our best effort at deciphering the testimony of Mr. Brooks, plaintiff's expert, without the benefit of the blackboard drawing to which he referred constantly. Mr. Brooks first described the construction of the 1970 Maverick. He pointed out the location of the car's center of gravity and explained that a force hitting the car at a certain point (where is not clear) will rotate it counterclockwise. Next, he seemed to say that the engine amount was the only thing fortifying the forward structure, and that it would shear if too great a force were transmitted to it. Finally, he testified that

> . . . the bumper tended . . . instead of going down under the—the vehicle, went up and that the car climbed and, of course, the spring—the coil spring in a Ford type vehicle and General Motors type vehicle, if the car is lifted slightly in front the wheel stays in contact because of the spring pressure holding it down. So once it went—over that, and raised that front left corner—the wheel stays on the ground—the front corner is elevated slightly and all that force is transmitted to this wheel and since this collapses here then we've got to visualize all of

this coming around now and allowing that wheel to come in to what would be the firewall and now the force is transmitted here which is then—puts the—puts the rocker panel in a bending position.

The remainder of his testimony dealt with what changes would have prevented the frame rail from bending and other details going to the car's reaction to a collision. We regret our inability to describe this incident more clearly, but we cannot create clarity where none exists.

4. The "second impact" refers to the reaction of persons or objects inside a vehicle to the vehicle's collision with some external object such as another vehicle or an immobile object. The crashworthiness of the vehicle determines how severe any injuries suffered as a result of the second impact will be. It is actually an enhancement of injuries theory, since some collisions would obviously be so violent that the vehicle's crashworthiness would be irrelevant.

5. For a general discussion of rule 49(a), see Brown, *Federal Special Verdicts: The Doubt Eliminator*, 44 FRD 338 (1968).

how much of 100% were they each proximately negligent?

Miss Lee <u>50%</u>

Maverick driver <u>50%</u>

(Must total 100%)

As to defendant Ford Motor Company:

1. (a) Did Ford perform its duty of designing and constructing an automobile that was reasonably safe for its intended use of being driven on the roads and highways?

 (X) Yes; ( ) No.

 (b) Did Ford perform its duty of designing and constructing an automobile that contained no latent or hidden defects which could cause an accident and subsequent injuries?

 (X) Yes; ( ) No.

2. Was this Maverick automobile reasonably suited for the purposes for which it was commonly intended?

 ( ) Yes; (X) No.

3. If the answer to any portion of the preceding is No, was Ford's breach of its said duty a proximate cause of Mrs. Higginbotham's death and Mr. Higginbotham's injuries?

 (X) Yes; ( ) No.

Damages:

1. (a) The "full value" of the life of Mrs. Higginbotham is <u>$190,000.00</u>. Expenses of her death <u>$2,500.00</u>.

 (b) Ford is to pay <u>$40,000.00</u> of that amount.

2. (a) Mr. Higginbotham's damages are <u>$10,170.00</u>.

 (b) Ford is to pay <u>$ none</u> of that amount.

On May 28, 1974, the court entered a judgment for plaintiff in the amount of $42,500 against Ford and $10,170 against the Lees. It amended this on May 31 to award only $40,000 against Ford.[6] Ford filed its motion for judgment n.o.v. or new trial on June 3, 1974, making vague allegations that the verdict was against the weight of the evidence and contrary to the evidence. On June 7, 1974, plaintiff filed a "motion to alter or amend the judgment," asserting that Georgia law forbids apportionment of verdicts between joint tortfeasors and that the full amounts of $10,170, $190,000, and $2,500 should therefore run jointly and severally against Ford and the Lees. Also on June 7, plaintiff moved for a new trial limited to the issue of the amount of his personal injury damages, which he asserted were grossly inadequate. The district court denied both Ford's and Higginbotham's motions on September 13, 1974, and this appeal followed.

III. Ford's Appeal: Denial of Judgment Notwithstanding the Verdict

 In its original briefs on appeal, Ford argued that its motion for judgment n.o.v. should have been granted because the pleading and proof showed that no defect peculiar to Diann Higginbotham's Maverick existed, yet the interrogatory that the jury answered unfavorably to Ford referred to "this Maverick automobile." After oral argument, in response to the Court's request, it added an argument to the effect that the Georgia Wrongful Death statute[7] does not comprehend an action for breach of warranty or an action under Georgia's new strict liability statute.[8] Although we are not persuaded by Ford's original argument,[9] our

---

6. In the May 31 order, the court explained its deletion of the $2,500 death expenses award with a note saying "Based on the jury's finding that the decedent was 50% negligent, there can be no recovery of the $2,500.00 for the expenses of her death." Ford moved to delete this explanation from the judgment, since the correct reason for awarding only $40,000 against Ford was the fact that the jury had authorized only $40,000. The court granted the motion and deleted the footnote in its judgment of September 13, 1974. The only effect of the finding of Diann's 50% negligence is to bar recovery against the Lees for her death. *See* note 17, *infra*.

7. Ga.Code Ann. ch. 105–13 (1968).

8. Ga.Code Ann. § 105–106 (1968).

9. We agree with Ford that none of the testimony at the trial dealt with the particular Ford Maverick purchased by Diann Higginbotham. If Interrogatory 2's reference to "this" Maverick could mean only the specific car involved in the accident, then Ford would be entitled to a

prediction of Georgia law compels us to hold that plaintiff cannot recover for his wife's wrongful death against Ford.[10] However, we hasten to add that the unavailability of the wrongful death statute has no effect on plaintiff's claims for his own personal injuries. We will discuss the wrongful death action first, and then the personal injury claim.

### A. Wrongful Death of Diann Higginbotham

The Georgia wrongful death statute is unusual, in that it permits recovery only for the "homicide" of various family members, defining "homicide" to include "all cases where the death of a human being results

from a crime or from criminal or other negligence." Ga.Code Ann. § 105–1301 (1968).[11] Thus, the question is whether the jury's finding that "this Maverick automobile" was not "reasonably suited for the purposes for which it was commonly intended" meant that Ford was guilty of "a crime or . . . criminal or other negligence."

The trial court's discussion with counsel prior to reading the charge to the jury indicates that Interrogatory 2 was based on the Georgia case of *Friend v. General Motors Corp.*, 118 Ga.App. 763, 165 S.E.2d 734 (1968), appeal dism'd, 225 Ga. 290, 167 S.E.2d 926. In *Friend*, the court held that allegations that a 1962 Greenbriar truck was "unmerchantable and not reasonably

judgment n.o.v. under *Boeing Co. v. Shipman*, 5 Cir. 1969, 411 F.2d 365. However, plaintiff suggests that the words "this Maverick automobile" referred to all 1970 model Mavericks, since all the testimony was admittedly about the 1970 Maverick in general. We think that this is a plausible reading of the question, particularly in light of the court's charge to the jury. "This" Maverick therefore meant this example of the 1970 Maverick; it did not imply that any defect peculiar to Diann's Maverick existed. Adopting this interpretation of the question, we cannot say that the evidence was insufficient to support the jury's negative answer.

10. Plaintiff points out, correctly that the argument based on the wrongful death statute was raised for the first time on appeal. Invoking the general rule, he asks this Court not to consider an issue not raised below. *Excavators and Erectors, Inc. v. Bullard Eng'rs, Inc.*, 5 Cir. 1973, 489 F.2d 318, 320. Unfortunately for plaintiff, that rule is not without exceptions. It does not apply if a manifest injustice would result from ignoring the new legal theory. On the other hand, the rationale for the rule requires its application if additional facts would have been developed in the trial court had the new theory been presented there; in that case judicial economy is served and prejudice is avoided by binding the parties to the facts presented and the theories argued below. *See Commercial Credit Business Loans, Inc. v. St. Louis Terminal Field Warehouse Co.*, 5 Cir. 1975, 514 F.2d 75, 77. In the case before us, however, the new theory raises a purely legal question. No facts could have been developed to aid our resolution of the issue. Furthermore, it was at this Court's request that the parties filed post-oral argument briefs discussing it. Under these circumstances, we believe it would be unjust now to refuse to consider

the new argument. *See Evans v. Triple R Welding & Oil Field Maintenance Corp.*, 5 Cir. 1973, 472 F.2d 713, 716; *Empire Life Ins. Co. v. Valdak Corp.*, 5 Cir. 1972, 468 F.2d 330, 334.

11. In contrast to the restrictive definition in the Georgia statute, most other statutes speak of some kind of "wrongful act." *E. g.*, Ala.Code Ann., tit. 7, § 123 (1960) ("the wrongful act, or omission, or negligence"), Fla.Stat.Ann., § 768.-19 (Supp.1975) ("the wrongful act, negligence, default, or breach of contract or warranty"); La.Civil Code, art. 2315 (1971) ("the wrongful death"); Miss.Code Ann., § 11–7–13 (1972) ("wrongful or negligent act or omission"); Tex. Rev.Civ.Stat.Ann. art. 4671 (Supp.1975) ("the wrongful act, neglect, carelessness, unskillfulness, or default"). The Federal Death on the High Seas Act, 46 U.S.C. § 761, covers "wrongful act, neglect, or default." The original wrongful death statute in England, Lord Campbell's Act, also said "wrongful Act, Neglect, or Default." Fatal Accidents Act of 1846, 9 & 10 Vict., c. 93 (1846).

The first Georgia statute gave a broad right of action "[i]n all cases hereafter where death shall ensue from or under circumstances which would entitle the deceased, if death had not ensued, to an action against the perpetrator of the injury. . . ." *See Thompson v. Watson*, 186 Ga. 396, 197 S.E. 774 (1938), *quoting* Cobb's Digest at 476. In 1856, the Georgia legislature passed an act giving a right of recovery for death caused by carelessness, negligence, or improper conduct. Acts 1855–56 at 155. The narrowed definition of homicide now in the Georgia statute seems to have been introduced in the 1887 amendment, Acts 1887 at 44. For a more comprehensive discussion of the early development of the Georgia law, see *Thompson v. Watson, supra.*

suited for the use intended" stated a claim against General Motors for injuries suffered from the "second impact" of a collision.[12] This is the so-called crashworthiness doctrine, discussed by this Court in *Perez v. Ford Motor Co.*, 5 Cir. 1974, 497 F.2d 82 (Louisiana law), and *Wooten v. White Trucks*, 5 Cir. 1975, 514 F.2d 634 (how Florida court would apply Kentucky law). *See also Dreisonstok v. Volkswagenwerk, A.G.*, 4 Cir. 1974, 489 F.2d 1066. A "crashworthy" vehicle is "one which, in the event of a collision, resulting accidentally or negligently from the act of another and not from any defect or malfunction in the vehicle itself, protects against unreasonable risk of injury to the occupants." *Dreisonstok v. Volkswagenwerk, A.G., supra*, 489 F.2d at 1069. Interrogatory 2 invited the jury to consider the crashworthiness of 1970 Mavericks.

■ The court's instructions to the jury made it clear that the theory upon which Interrogatory 2 was based was implied warranty.[13] The instruction read:

Next of all, ladies and gentlemen, as to Ford, there is a law of the State of Geor-gia that is called an implied warranty. In part it says, 109(a)(2) 314—"A warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." And further it says, that "goods to be merchantable must be at least such as are fit for the ordinary purposes for which such goods are used." Therefore Ford, as an automobile manufacturer, impliedly warrants in selling its automobiles that its automobile is fit for the ordinary purposes for which automobiles are used. That means ladies and gentlemen, by ordinary purposes for which such goods are used, that Ford impliedly warrants that the automobile in question was reasonably suited for the purpose for which it was commonly intended. . . .

The next question [Interrogatory 2] asks you to determine whether or not this Maverick was reasonably suited for the purposes for which it was commonly intended . . . .

unreasonable risk of injury in the event of a collision. (Emphasis added.)

Reading Interrogatories 1(a) and (b) in light of these instructions, it seems evident that 1(a) and 1(b) submitted all negligence theories to the jury. At oral argument, plaintiff suggested that 1(a) and (b) went to the question whether the vehicle was safe to drive at all, in contrast to 2, which went to crashworthiness. This is a strained construction, particularly considering the portions of the charge we have emphasized. The more logical way to reconcile Interrogatories 1(a) and (b) with Interrogatory 2 is to say that 1(a) and (b) dealt with both drivability and crashworthiness on a negligence theory, and 2 dealt with both on a warranty theory. The fact that the jury answered favorably to Ford on negligence and unfavorably to Ford on warranty did not create an unreconcilable inconsistency.

The reason that none of the instructions mentioned strict liability as a theory under which Ford would be liable is simply that the Georgia Supreme Court had not yet announced that Ga.Code Ann. § 105–106 (1968) made Georgia a strict liability state. The relationship between strict liability and the implied warranty of merchantability is discussed *infra* at page 770.

---

12. *Friend* was decided before Georgia recognized strict liability; the allegations that the truck was not reasonably suited for the use intended therefore stated only an implied warranty claim.

13. In contrast, interrogatories 1(a) and (b) were based on traditional negligence concepts, as articulated in *Larsen v. General Motors Corp.*, 8 Cir. 1968, 391 F.2d 495. The jury was told that

Ford's duty of care extends to designing and constructing an automobile that is reasonably safe for its intended use of being driven on the roads and the highways, and that contains no latent or hidden defects which could cause an accident *and subsequent injuries.*

Next of all, Ford, as a manufacturer, has a duty to use reasonable care under the circumstances in the design of its product, but is not an insurer that its product is incapable of producing injury, and this duty of design is met when the automobile is safe for its intended use, *and when it will fairly meet any emergency of use which is foreseeable.* . .

[A]n automobile manufacturer is under no duty to design an accident-proof or foolproof vehicle, but such manufacturer is under a duty to use reasonable case in the design of his vehicle to *avoid subjecting the user to an*

The jury found that the Maverick was not reasonably suited for the purposes for which it was commonly intended.

■■■ If the implied warranty of merchantability found in Ga.Code Ann. § 109A–2–314 (1973) were plaintiff's only theory, then it would be clear that he could not recover for his wife's wrongful death. In *Lashley v. Ford Motor Co.*, 5 Cir., 480 F.2d 158, 159, *cert. denied*, 1973, 414 U.S. 1072, 38 L.Ed.2d 478, 94 S.Ct. 585 this Court held:

> The trial judge was correct in his ruling that in Georgia one cannot recover for wrongful death on a theory of breach of implied warranty, either under the Uniform Commercial Code or prior law.

See *Lovett v. Emory University, Inc.*, 116 Ga.App. 277, 156 S.E.2d 923 (1967).[14] However, in 1968 the Georgia legislature added a new statute making manufacturers strictly liable in tort, which incorporates merchantability language as part of the standard of behavior:

> [T]he manufacturer of any personal property sold as new property, either directly or through a dealer or any other person, shall be liable *in tort, irrespective of privity,* to any natural person who may use, consume or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was *not merchantable and reasonably suited to the use intended* and its condition when sold is the proximate cause of the injury sustained . . . .

Ga.Code Ann. § 105–106 (1968). (Emphasis added.) Although this statute suffers from inartistic draftsmanship, a few observations are possible. First, rather than adopting the classic tort standard condemning defective products that are "unreasonably dangerous to the user or consumer or to his property," found in the Restatement (Second) of Torts § 402A (1965), the Geor-

gia legislature chose language reminiscent of the Uniform Commercial Code's implied warranty of merchantability section, 2–314, Ga.Code Ann. §§ 109A–2–314, 109A–2–314(2)(c) (1973). Section 105–106 makes manufacturers liable without regard to contractual privity. If the statute said no more, the new strict liability would be simply a special case of the contractual theory of breach of an implied warranty of merchantability. The statute does say more, though: the new species of liability is specifically said to be "in tort." The purpose of this provision was probably to ensure that prospective plaintiffs would not be troubled by disclaimers and notice requirements. See Hunter, *Georgia's New Statutory Liability For Manufacturers: An Inadequate Legislative Response*, 2 Ga.L.Rev. 538, 562 (1968). Instead of achieving this result by the analytically consistent method of a standard such as the Restatement's the legislature imposed tort liability under a breach of a contract standard.

■■■ The practical result of this statutory standard for Higginbotham's case is that the jury's answer to Interrogatory 2, finding that the Maverick was not reasonably suited for the purposes for which it was intended, could support a finding of manufacturer liability under section 105–106. The only difference between 105–106 and the implied warranty theory upon which they were instructed is that the privity requirement is abolished, no notice or disclaimer considerations can enter the case (although none were present anyway), and the theoretical label shifts from "contract" to "tort." Thus, despite the lack of instructions on strict liability, we must determine whether plaintiff's wrongful death award can be sustained under the new statute.

Squarely faced with the question whether a claim for wrongful death under Georgia law can be founded on strict liability, Judge Hill of the United States District Court for

---

14. The Georgia courts have consistently held that the wrongful death statute must be strictly construed, since it is in derogation of the common law. *See, e. g., Thompson v. Watson*, 186 Ga. 396, 197 S.E. 774 (1938); *Lovett v. Garvin*, 232 Ga. 747, 208 S.E.2d 838 (1974). Since the statute permits a recovery only for various kinds of "negligence," breach of implied warranty does not fall within its ambit.

the Northern District of Georgia found that no recovery was possible in *Howard v. The Heil Co.*, Civil No. C 75–1096 A (N.D.Ga., filed Nov. 14, 1975). He first noted that the Georgia Supreme Court has expressly stated that the theory of strict liability is now available in Georgia. *Center Chemical Co. v. Parzini*, 234 Ga. 868, 218 S.E.2d 580 (1975); *Ellis v. Rich's, Inc.*, 233 Ga. 573, 212 S.E.2d 373 (1975). *See also Stokes v. Peyton's, Inc.*, 5 Cir. 1976, 526 F.2d 372. Next, he pointed out that the *Ellis* court chose to move cautiously when it recognized the viability of strict liability, quoting from *Ellis*:

. . . Code Ann. § 105–106 as well as Code Ann. § 109A–2–318 [action based on breach of warranty] are recent expressions of the legislature establishing but also limiting the public policy of this state in this area. Consequently, these legislative enactments preclude any extension of strict liability by this court.

**15.** Georgia has no certification statute.

**16.** There are a number of ways in which a Georgia court might construe the wrongful death statute as permitting a strict liability claim. It might say that the legislature intended to broaden the term "other negligence" in the death statute to encompass the manufacture of a defective product, noting that the strict liability statute is far more recent than the wrongful death statute. The editorial note to Ga.Code Ann. § 105–1301, which defines "homicide" warns that "[b]ecause of the strict construction of the wrongful death statutes and the tendency of the legislature to liberalize them, all older cases must be considered in the light of possible subsequent legislation." The new strict liability legislation, according to this argument, implicitly modified the old wrongful death statute. The main argument against this approach is that the Georgia courts are construing the strict liability statute narrowly also. *See Ellis v. Rich's Inc.*, 233 Ga. 573, 212 S.E.2d 373 (1975). Presumably, a strict construction of the legislature's silence on the relationship between the strict liability statute and the near-draconian wrongful death statute would lead the Georgia Supreme Court to the conclusion that no implicit modification of the earlier law was intended.

Secondly, a Georgia court might choose to adopt reasoning similar to that in *General Motors Corp. v. Hebert*, 501 S.W.2d 950 (Tex.Civ. App.—Houston [1st Dist.], writ ref'd n.r.e.). In response to the same argument that Ford is making here, the Texas court pointed out that the plaintiff in a wrongful death action was permitted to assert any basis for recovery that

212 S.E.2d at 376. Finally the *Howard* opinion recognized that when the Georgia Court of Appeals attempted to equate statutory strict liability in tort with a satisfactory showing of negligence, in *Parzini v. Center Chemical Co.*, 134 Ga.App. 414, 214 S.E.2d 700 (1975), the Supreme Court vacated that portion of the opinion and held that the claimant was not required to prove negligence. 218 S.E.2d at 582.

■ Judge Hill concluded from these cases and from Georgia's rule requiring strict construction of statutes in derogation of the common law that Georgia's wrongful death statute allows no recovery under a strict liability theory. *See* note 14, *supra.* Were we a Georgia court, instead of a federal court straining for clairvoyance as to how a Georgia court would answer this question of first impression,[15] we might feel freer to reject the *Howard* result as inconsistent with the public policy of Georgia.[16]

the decedent could have asserted if he were alive. Continuing, the court said:

It would be unjust to interpret Articles 4671 and 4672 as allowing, in products liability cases, a recovery for an injury but not for a death. In interpreting statutes, we are not to attribute to the legislature an intention to work an injustice.

501 S.W.2d at 959. Although "the gist of the [Georgia] action is not the injury suffered by the deceased, but the injury suffered by the beneficiaries, resulting from the death of the deceased," the cause of action is dependent on the fact of an actionable tort against the deceased. *Lovett v. Garvin*, 232 Ga. 747, 208 S.E.2d 838 (1974). *See Caskey v. Underwood*, 89 Ga.App. 418, 79 S.E.2d 558 (1953). Since the manufacture of a defective product can create an actionable tort now, if a person dies as a result of the tort, the wrongful death statute should give an action to the beneficiaries. Our reason for rejecting this alternative is simply the contrast in the actual language of the Georgia statute with that of most other statutes (including Texas'). *See* note 11, *supra*.

We do not mean to exhaust the possibilities that would be available to a Georgia court. A negligence per se approach might be defensible, as plaintiff suggests, or an analogy to the cases supporting a wrongful death for unseaworthiness might be persuasive. Because we are not a Georgia court, however, we feel compelled to reject these possibilities and decide this case in accordance with our best guess of a Georgia court's probable disposition.

However, our duty under *Erie Railroad v. Tompkins*, 1933, 304 U.S. 64, 82 L.Ed. 1188, 58 S.Ct. 817, is to try to come to the same result that would be reached in the state court. *Oliva v. Pan American Life Ins. Co.*, 5 Cir. 1971, 448 F.2d 217. *See Stephens v. State Farm Mutual Automobile Ins. Co.*, 5 Cir. 1975, 508 F.2d 1363; *Delta Air Lines, Inc. v. McDonnell Douglas Corp.*, 5 Cir. 1974, 503 F.2d 239, *cert. denied*, 1975, 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451; *Benante v. Allstate Ins. Co.*, 5 Cir. 1973, 477 F.2d 553. Judge Hill, in our opinion, correctly discerned the probable result in his *Howard* decision. The consistency with which the Georgia Supreme Court has adhered to a strict construction of the wrongful death statute, the notable difference between the wording of the Georgia statute and most other statutes, and the conservative approach that characterized Georgia's maiden voyage into strict liability all persuade us that we too must hold that the wrongful death statute cannot encompass a strict liability claim. The engine on the *Erie* tracks will simply not reverse and carry the train to the opposite destination. The district court on remand should grant Ford's motion for judgment notwithstanding the verdict as to the wrongful death claim.

**B. Personal Injuries of Michael Higginbotham**

■ Construing Interrogatory 2 as asking whether the 1970 Maverick was reasonably suited for the purposes for which it was commonly intended, *see* note 9, *supra,* we find from our review of the record that the evidence was sufficient to support the jury's negative answer. Interrogatory 2, however, dealt only with the standard Ford was required to meet. Equally essential to an ultimate finding of liability for damages were the jury's answers to Interrogatory 3

(that Ford's breach of its duty was a proximate cause of Mrs. Higginbotham's death and Mr. Higginbotham's injuries) and to Damages Interrogatory 2 (that Mr. Higginbotham suffered damages in the amount of $10,170). Higginbotham's problem in executing against Ford for these damages is simple: the jury expressly found that Ford was to pay *none* of the $10,170 award. The district court's decision to let the jury apportion damages between Ford and the Lees, and the actual apportionment that resulted, bring us to the plaintiff's cross appeal.

**IV. Higginbotham's Cross Appeal**

The two issues that Higginbotham raises on his cross appeal are first, whether the jury should have been permitted to apportion the damages between Ford and the Lees,[17] and second, whether the district court erred in denying his motion for a partial new trial limited to the issue of amount of damages. Although we agree with Ford that apportionment was appropriate in this situation, we find an irreconcilable inconsistency between the jury's findings that Ford breached its duty, that its breach proximately caused the injuries, that damages in the amount of $10,170 were incurred, but that Ford was liable for none of those damages.

■ The root of the problem lies in the fact that the interrogatory on proximate cause was ambiguous in that it did not segregate the death claim and the personal injury claim. From the jury's specification that Ford was to pay $40,000 for the wrongful death and none for the injuries, it might be possible to infer that the jury actually found that Ford proximately caused the death but not the injuries. Such a conclusion, however, flies directly in the face of

---

17. The jury found that Higginbotham's personal injury damages were $10,170, and that Ford was to pay none of that amount. It also found that Ford was to pay $40,000 of the $190,000 wrongful death damages. Because of our decision with respect to the death claim, we need not consider the validity of apportioning those damages. Higginbotham cannot recover

against Ford because Ford was guilty of no negligence, and he cannot recover against the Lees because Diann Higginbotham's 50% negligence bars recovery against them under Georgia's comparative negligence rule. *See, e. g., Kirkland v. Moore,* 128 Ga.App. 34, 195 S.E.2d 667 (1973).

the jury's "yes" answer to the omnibus question on proximate cause. Accepting the jury's findings that the Maverick was not reasonably suited for its intended use, that this unsuitability proximately caused the injuries, and that the damages amounted to $10,170, then even if apportionment were permitted, Ford would be liable for some amount of damages greater than zero. We can find no rational, non-speculative way to reconcile these two essential jury findings.

■ Much as we regret it, we see no alternative to remanding the proximate cause issue to the district court for a redetermination of the question whether Ford's breach of its duty proximately caused Higginbotham's personal injuries. This issue seems sufficiently severable from the issues of amount of damages and breach of implied warranty (or strict liability) to make a new trial on all issues unnecessary. *Cf. Magneau v. Aetna Freight Lines, Inc.,* 1959, 360 U.S. 273, 279, 79 S.Ct. 1184, 1188, 3 L.Ed.2d 1224, 1229 (issue whether decedent was an employee so interrelated with ultimate issues of liability and damages that limited hearing not in the interest of fairness and efficiency); *Weymouth v. Colorado Interstate Gas Co.,* 5 Cir. 1966, 367 F.2d 84, 87 (appeal taken after second trial in which only issue remaining was market value of natural gas). *See generally* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2505 (1971). If the second jury finds that Ford's Maverick did not cause any injuries to the passenger over and above those that would have occurred if the car had been reasonably suited to its intended use, then the case would end there. If, however, it finds that Ford was a proximate cause of such injuries, then the issue of apportionment of the $10,170 will surface again. For that reason, we deem it appropriate to set forth our views on that point.

■ Georgia permits apportionment of damages only if the two (or more) parties are not joint tortfeasors. Put another way,

if the parties were joint tortfeasors, then Georgia law is clear that they are jointly and severally liable for the full amount of plaintiff's damages. *Mitchell v. Gilson,* 233 Ga. 453, 211 S.E.2d 744 (1975). *See Gates v. L. G. DeWitt, Inc.,* 5 Cir. 1976, 528 F.2d 405, 413 (Georgia follows rule of no apportionment among joint tortfeasors).

■ In *Mitchell,* the Georgia Supreme Court approved the following standard to govern the determination of when damages are apportionable:

If the separate and independent acts of negligence of two or more persons or corporations combine naturally and directly to produce a single indivisible injury other than a nuisance, and if a rational basis does not exist for an apportionment of the resulting damages among the various causes, then the actors are joint tortfeasors, jointly and severally liable for the full amount of plaintiff's damages, notwithstanding the absence of voluntary intentional concert of action among them.

211 S.E.2d at 745. Although this standard refers to acts of "negligence," we think that a Georgia court would apply it to strict liability for defective products.[18] Unlike the wrongful death situation, which involves a statute in derogation of the common law, whether parties are joint tortfeasors is a nonstatutory question wholly within the common law. The rule requiring strict construction of the wrongful death act therefore does not govern this determination, and we are free to reconcile the new statute with existing case law as a Georgia court might.

■ The two recent Georgia Supreme Court cases construing Ga.Code Ann. § 105–106 make it clear that Georgia is now a strict liability state, and that the theoretical basis of the claim is in tort. *Center Chemical Co. v. Parzini,* 234 Ga. 868, 218 S.E.2d 580, 581 (1975); *Ellis v. Rich's, Inc.,* 233 Ga. 573, 212 S.E.2d 373 (1975). The Georgia courts have held that the fact that

18. We have already found that the jury's verdict can support Ford's liability on a strict liability theory. *See* page 769 *supra.*

two persons owe differing degrees of care or differing duties toward the injured party does not prevent them from being joint tortfeasors. *Isom v. Schettino,* 129 Ga.App. 73, 199 S.E.2d 89 (1973); *Gosser v. Diplomat Restaurant, Inc.,* 125 Ga.App. 620, 188 S.E.2d 412 (1972); *Piller v. Hanger Cab Co.,* 115 Ga.App. 260, 154 S.E.2d 420 (1967). Although Georgia has not yet directed its attention to the place of strict liability in this scheme, we think that it would view strict liability as simply a different degree of care owed by the manufacturer. If the manufacturer breaches his duty of care, and his act combines with another party's tortious act to produce a single indivisible injury, and if no rational basis exists for apportionment of damages, then the two should be considered joint tortfeasors under Georgia law.

We have no trouble here with the breach of duty and single indivisible injury components of this test. However, the fact that Ford is liable only for the injuries over and above those that would have occurred in a crashworthy car convinces us that a rational basis for apportionment exists. Just as Ford proximately caused only the enhancement of injuries, so should it be liable only for the amount by which its defective product enhanced the injuries. Thus, on retrial, if the jury finds proximate causation, it should also be asked to apportion the total amount of the personal injury damages between Ford and the Lees.

The last point we must consider is whether the second jury should be permitted to re-evaluate the absolute amount of Higginbotham's personal injury damages. He argues that the award was grossly inexcessive in light of the evidence; Ford responds by disputing that point, and in the alternative by arguing that the amount is so intertwined with the liability issue that a new trial on all issues would be preferable to a partial new trial. In light of the documentary evidence that went to the jury room, we do not find the $10,170 award so grossly inadequate as to require a new trial limited to this issue. On remand, if the jury finds proximate cause, it should be asked only to set out the relative amount by which the defective automobile enhanced Higginbotham's injuries—specific dollar figures would be unnecessary. Because the percentage by which damages were enhanced is a separable issue from the amount of damages, we see no reason to disturb the first jury's finding on amount.

## V. Conclusion

We have been compelled by the abnormally restrictive language of the Georgia Wrongful Death statute to reverse the jury's award of $40,000 for Diann Higginbotham's death. Although the quality of Georgia mercy is strained indeed in the wrongful death area, as a federal court sitting in a diversity case we are forced to abide by our prediction of the result that a Georgia court would reach. Our task has been to schedule the correct *Erie* run and to attempt to clear the track of legal debris. *Erie* can be a stern disciplinarian, commanding us to follow even the strict, if not antiquated, substantive law of a state. Yet obey we must, when we are certain of the result that would be reached in a state court. With regard to the personal injury claim, the ambiguity of the proximate cause interrogatory and our inability to reconcile the existing affirmative answer with a finding of no liability for damages requires us to remand this issue for a second jury's more precisely directed consideration. If that jury finds that the uncrashworthiness of the vehicle enhanced Higginbotham's injuries, it should indicate by what proportion, so that the court may properly apportion the $10,170 award. Finally, we hold that the amount of damages on the personal injury claim awarded by the first jury must remain undisturbed; the lower court's denial of a partial new trial was correct.

We therefore affirm the district court in part, and reverse and remand in part for further proceedings in accordance with this opinion.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

JOHN R. BROWN, Chief Judge, concurring in part and dissenting in part:

Although I concur in the rest of the majority's opinion, I must dissent from its ruling that Georgia's wrongful death statute does not encompass strict liability claims.

The best that can be said for the holding is that it is "one of those situations where the decision is bound to be right because it is so wrong . . . ." *Gulf Oil Corp. v. Panama Canal Corp.*, 5 Cir., 1969, 407 F.2d 24, 26.

No Georgia appellate court has spoken to the specific issue at hand.[1] In such a case, a "Federal Court may look to all resources including 'the decisions of other states, federal decisions or the general weight of authority,' the goal being 'that the federal court reach the result that would probably be reached were the question to be litigated in a state court.'" *Cottonwood Mall v. Utah Power Co.*, 5 Cir., 1971, 440 F.2d 36, 40. The majority, relying on three factors—the "consistency with which the Georgia Supreme Court has adhered to a strict construction of the wrongful death statute, the notable difference between the wording of the Georgia statute and most other statutes, and the conservative approach that characterized Georgia's maiden voyage into strict liability"—rules that "we too must hold that the wrongful death statute cannot encompass a strict liability claim." *See supra*, at 772.

I cannot say for certain that the majority's prediction of Georgia law is incorrect. Such certainty will come only when the Georgia courts speak on this subject. I can safely assert, however, that the majority unreasonably limited itself in its search for the law which a Georgia court would apply. Surely the fact that many American jurisdictions today allow strict liability recovery under wrongful death statutes[2] should play some part in our *Erie* determination when there is no Georgia law directly on point. Yet the majority's reasoning fails to take this factor into account. In making our *Erie* determination, we may also look to trends in the law, and there is no escape from the conclusion that the trend toward imposing strict liability for injuries and death resulting from defectively manufactured products has assumed the proportions of an avalanche.[3] Georgia's recent transformation to a strict liability state[4] only serves to underscore this fact. Again, the majority does not rely on this factor.

Also, there is a fact which the majority recognizes,[5] but which plays no part in its conclusion that Georgia courts would allow no strict liability recovery for wrongful death. This is that the rule announced by the Court today—that a person who is only injured by a defectively-made product may recover damages under a theory of strict liability, while a person who is killed by the same defect may not—creates a distinction which is palpably unjust, if not completely irrational.[6] We, as a Federal Court engaged in the tricky task of attempting to predict State Court behavior, should pause long and hard before concluding that a State Court would act irrationally and unjustly, in a manner completely at odds with

**1.** *But see Etheridge v. Georgia Power Co.*, No. C–12911, Superior Court of Fulton County, Georgia, June 16, 1976, holding that Georgia law permits recovery for wrongful death under the theory of strict liability in tort.

**2.** *See,* R. Hursh and H. Bailey, American Law of Products Liability 2d § 4:19 (1974); Prosser, Torts 903 (4th ed. 1971); 22 Am.Jur.2d Death § 19.

**3.** *See* Prosser, Torts 657–58 (4th ed. 1971).

**4.** *See Ellis v. Rich's, Inc.*, 1975, 233 Ga. 573, 212 S.E.2d 373.

**5.** See *supra*, at 774.

**6.** Judge Friendly's pithy comment surely fits here: "The compulsion felt by my brothers . . . to reach what seems a palpably unjust result reminds me of Chief Justice Erle's observation as to the occasional predilection of the best of judges for 'a strong decision,' to wit, one 'opposed to common-sense and to common convenience.'" *Spanos v. Skouras Theatres Corp.*, 2 Cir., 1966, 364 F.2d 161, 167.

the vast current of authority in other American jurisdictions.

Finally, the majority disregards the obvious purpose of the legislature in its enactment of §§ 105–106. The Court disparages it because it is not in the ALI mold, but is reminiscent of the UCC merchantability test. Actually the so-called merchantability standard may be more liberal than the other. In the ALI test one has to prove unreasonable danger—sometimes a formidable task. On the merchantability standard one need only prove the thing failed under its usual expected use. Far from originating in the UCC or its common law ancestors, this is the classic case of unseaworthiness—a standard probably the most liberal in all fields of the law.

Of course we part not on which of the two concepts is more or less liberal or strict. What we differ on is the failure to construe the ancient death statute in terms of the recent marked change in Georgia's idea on what can constitute a "tort"—which is another descriptive for the magic word "negligence."

The new section not only imposes a standard of performance on the manufacturer, it then characterizes the consequences of nonperformance as a liability "in tort, irrespective of privity" to persons injured.

The majority disregards the specific legislative characterization that the breach constitutes a tort—something far different from UCC-law merchant claims on warranty. I think the legislature was trying to say that such claims would take the course of the usual damage suit sounding in tort, that is, based on negligence. The code creates a new species of negligence—failure to manufacture an article reasonably suited for its expected use.

I decline to predict that the Supreme Court of Georgia will read a new section as applicable only to nonfatal consequences thereby bringing about a result both shocking and unjust. I predict they will construe the death statute and precedential materials to have been modified by the new code section. Unfortunately, even if I have this assumed prescience, it will not do Grady Michael Higginbotham any good. He and the estate will be just another victim of *Erie*—unable to recall a past mistake in determination of local law.[7]

---

7. It is unfortunate that Georgia, unlike Florida, Louisiana and Alabama, does not have a procedure for certifying questions to the Supreme Court of Georgia.

See *Cincinnati Ins. Co. v. City of Talladega,* 5 Cir., 1976, 529 F.2d 718; *ITT Rayonier, Inc v. Wadsworth,* 5 Cir., 1976, 528 F.2d 1033; *Southeastern Financial Corp. v. Smith,* 5 Cir., 1976, 526 F.2d 1233; *Tyler v. Insurance Co. of North America, Inc.,* 5 Cir., 1975, 520 F.2d 341; *Barnes v. Atlantic & Pacific Life Ins. Co.,* 5 Cir., 1975, 514 F.2d 704, on certification, 1975, 295 Ala. 149, 325 So.2d 143, on receipt of answers to certification, 5 Cir., 1976, 530 F.2d 98; *H. S. Equities, Inc. v. Hartford Accident & Indemnity Co.,* 5 Cir., 1975, 512 F.2d 1277; *Nardone v. Reynolds,* 5 Cir., 1975, 508 F.2d 660, on certification, Fla., 1976, 333 So.2d 25; and cases cited in *Nardone v. Reynolds, supra,* at 663 n. 6; in *Coastal Petroleum v. Secretary of Army,* 5 Cir., 1973, 489 F.2d 777, 779 n. 5, on rehearing, 1974, 491 F.2d 973; and in *Allen v. Estate of Carman,* 5 Cir., 1971, 446 F.2d 1276, 1277 n. 1.